UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JESUS CASAREZ,
Individually and on Behalf of All
Others Similarly Situated,

Plaintiff,

v.

PRODUCERS SERVICE
CORPORATION,

Defendant.

Case No. 2:17-cv-1086
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on Plaintiff Jesus Casarez's, Individually and on Behalf of

All Others Similarly Situated, ("Plaintiff") Motion for Partial Summary Judgment (ECF No. 52)

and Contingent Motion for Partial Summary Judgment (ECF No. 54), Defendant Producers

Service Corporation's ("Defendant") Response in Opposition (ECF No. 63), Plaintiff's Reply in

Support (ECF No. 65), and Defendant's Motion for Summary Judgment (ECF No. 62),

Plaintiff's Response in Opposition (ECF No. 64), and Defendant's Reply in Support (ECF No.

66). For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is

**GRANTED** in part and **HELD IN ABEYANCE** in part (ECF No. 52), Plaintiff's Contingent

Motion for Summary Judgment is **DENIED** as moot (ECF No. 54), and Defendant's Motion for

Summary Judgment is **DENIED** (ECF No. 62).

## I.    BACKGROUND

This action arises out of alleged violations of the Fair Labor Standards Act ("FLSA")

29 U.S.C. §§ 201 et seq., the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), Ohio

Revised Code §§ 4111.01, 4111.03, and 4111.19, and the Ohio Prompt Pay Act ("OPPA"), Ohio

Revised Code § 4113.15. Plaintiff brings this action both individually and on behalf of all others

similarly situated as a collective action pursuant to Section 16(b) of the FLSA and as a class

action pursuant to Federal Rule of Civil Procedure 23. (Compl. ¶ 17, ECF No. 1.) On May 25,

2018 the Court granted Plaintiff's Motion for Conditional Certification of Collective Action and

named the class "[a]ll current and former employees of Defendant who were employed as non-

management oilfield operations employees for Defendant at any time since December 14, 2014."

(ECF No. 18.) Plaintiff alleges Defendant does not pay its non-management oilfield operations

employees overtime wages as required by the FLSA, OMFWSA, and OPPA. (Compl. ¶ 4.)

Defendant is a for-profit limited liability company providing products and services in the

oil and gas industry throughout the United States. (Parks Dep. at 13:9–13, ECF No. 60.)

Defendant employed Plaintiff as an oilfield equipment operator, a non-management oilfield

operations position. (*Id.* at 14:10–21.) Non-management oilfield equipment operators provide

the manual labor needed for pumping and fracking oil wells on site including loading,

assembling, operating, and disassembling the equipment involved. (*Id.* at 15:7–24.)

**A. Plaintiff's Schedule**

Defendant's work for its customers requires fracking operations to run 24-hours per day.

(*Id.* at 21:13–22:1.) Defendant's employees work 12-hour shifts and stay in camps or hotels

while working. (*Id.* at 20:18–22:8.) Defendant allows its employees to choose to work either

(1) fourteen days on and then seven days off; or (2) seven days on and then four days off,

followed by seven days on and then three days off. (*Id.* at 17:25–18:17.) Defendant offers these

two schedules "to give [employees] some options as far as their ability to be at home versus

being out for two solid weeks." (*Id.* at 18:12–17.) The total labor is the same whether the

2

employee chooses the first or second schedule. (*Id.* at 19:24–20:5.) Plaintiff and the other non-managerial oilfield operations employees regularly work more than forty hours per week. (*See e.g.*, Pl.'s Br. Supp. Pl.'s Mot. Summ. J. Regarding Belo Contract, Ex. E [hereinafter Pl.'s Mot. Summ. J.], ECF No. 53.) At times, they also work less than forty hours per week. (*Id.*)

In their depositions, Defendant's non-managerial oilfield operations employees provided a variety of reasons as to why their schedules fluctuated above and below forty hours per week. Several employees agreed that their work hours varied each week due to the amount of work available at the time. (Foster Dep. at 66:22–67:1, ECF No. 58; Nathaniel Jones Dep. at 97:9–98:4, ECF No. 59.) For example, counsel for Defendant asked Nathaniel Jones, who in the past was a non-managerial oilfield operations employee for Defendant, "[i]s it fair to say that how many hours you worked in a given week over the course of your employment was just determined by the work . . . [h]ow much work there was to do?" (Nathaniel Jones Dep. at 97:9–14.) He responded, "[y]es." (*Id.*) Counsel for Defendant also asked Nathaniel Jones, however, if he agreed that "because of the fluctuations in the market and the industry, [he] did [not] necessarily know how much work there was going to be to do . . . week to week, month to month." To this question Nathaniel Jones responded: "[w]e would know. We had a projected outline. They would tell us we [have] got four jobs for December . . . so we had a short outlook on how much work we had." (Nathaniel Jones Dep. at 98:5–17.)

Similarly, Defense counsel asked Keith Jones, a non-managerial oilfield operations employee for Defendant, what he knew about the up and down of the oilfield in comparison to how much work he had. (Keith Jones Dep. 22:1–2, ECF No. 61.) Keith Jones responded that "part of it is working extra hard when we [are] understaffed due to the wide range of fluctuation. One day we may have nothing to do, but the next time we [are] having to work an extreme

amount of hours under extreme circumstances." (*Id.* at 22:8–12.) Importantly, however, he testified later that an increase in hours in a given week was because they "were scheduled more work that week than [the] next week . . . it was scheduling on the management['s] part." (*Id.* at 51:11–13.) Thus, due to several different factors, the schedules varied from week to week, but Plaintiff, and those on whose behalf he brings this suit, did have advance notice of the hours they would be working. (Nathaniel Jones Dep. at 98:5–17; Keith Jones Dep. 22:8–12. 51:11–13.)

## B. Plaintiff's Compensation

Plaintiff, and those employees on behalf of which he brings this suit, are paid a base pay, stage pay, and quarterly bonuses. [1]

### 1. Base Pay

Plaintiff, and those on behalf of whom he brings this action, are paid a specific amount, for most employees $1,538.00, bi-weekly, as laid out by the document given to employees labeled "Terms of Agreement" ("Terms of Agreement"). (Def.'s Resp. Opp'n Pl.'s Mot. Conditional Certification, Ex. A, ECF No. 15.) The Terms of Agreement refers to this payment schedule as the "Belo bi-weekly pay schedule." (*Id.*) Further, the Terms of Agreement states there will be "additional overtime after 60 hours." (*Id.*) This specific amount paid bi-weekly, referred to as base pay, is the pay the worker is entitled to for working forty hours a week at their regular wage and twenty more hours a week at one and one-half times their regular wage. For example, for employees with a base pay of $1,538.00 bi-weekly, this amount represents being paid $10.99 per hour for the first forty hours a week, and then $16.38 per hour for the remaining twenty hours. (Parks Dep. at 24:5–11.) Employees receive this base pay regardless of how

---

[1] In the Defendant's briefing they also mention a third type of payment, year-end bonuses. (Def.'s Mot. Summ. J. at 13.) The parties, however, do not appear to argue that year-end bonuses effect the Belo contract or have any other effect on this case. As such, the Court will only address base pay, stage pay and quarterly bonuses, the payments in dispute.

many hours they worked that week. (Leeper Decl. ¶ 17, ECF No. 60–1.)

## 2. Stage Pay

In addition to base pay, employees receive stage pay. (Def.'s Resp. Opp'n Pl.'s Mot. Conditional Certification, Ex. A; Casarez Dep. at 43:1–2, 93:3–6, 94:6–95:10, ECF No. 57.) Defendant's fracking process requires drilling "stages." (Parks Dep. at 25:9–19.) Twenty-four-hour shifts produce anywhere from zero to eleven stages depending on the demands of the customer. (*Id.*) Employees who are clocked in and work either twelve-hour shift in the twenty-four-hour period get credit for one-half of the stages drilled that day. (*Id.* at 25:10–19.) Stage pay is paid at a rate of $40.00 to $50.00 per stage and is specifically mentioned in the Terms of Agreement. (*Id.* at 57:23–58:5, Ex. 5 (stating "additional stage pay will be paid at the current rate per customer job site").)

Employees testified that stage pay is generally paid when a stage is completed. Jesus Casarez testified that employees have always been paid stage pay when a stage is completed, unless there are safety violations, performance issues, or another need for discipline. (Casarez Dep. at 40:3–10, 43:1–2, 43:11–16, 69:14–20.) Similarly, Keith Jones stated that while the amount paid for the bonuses was up to management, his bonuses were never withheld, though he never had any quality issues with his stages. (Keith Jones Dep. at 6:20–24, 44:6–8.) He also stated that when he started working for Defendant a supervisor told him there are bonuses for finishing a stage and "[i]f [they] were to finish that stage, [they] were to be paid—cut and dry." (Keith Jones Dep. at 20:9–12.) Nathaniel Jones testified that stage pay payment "amounts fluctuated [and] [y]ou earned it if you were on the pad, if you were in the crew working." (Nathaniel Jones, Dep. 42:15–17.) He also noted, however, that it was the company's choice whether to pay the bonuses and there were times when he did not get the bonus for a completed

stage. (*Id.* at 43:7–44:24.)

### 3. Quarterly Bonuses

In addition to base pay and stage pay employees receive quarterly bonuses. (*Id.* at 37:25–38:8.) Quarterly bonuses are mentioned in the Producers Service Corporation Employment Manual ("Employment Manual"). (Parks Dep. Ex. 4 at 27.) Like stage pay, management determines whether an employee gets a quarterly bonus. (*Id.* at 36:20–22, ECF No 60.) In making this determination management considers many factors including the number of days the employee worked that quarter, Defendant's profitability at that time, and the employee's dependability, performance, and attitude throughout the quarter. (*Id.* at 38:12–17, 43:18–44:12.) These factors, along with the employee's supervisor's evaluation, are entered into a spreadsheet which will compute the sum of the employee's quarterly bonus. (*Id.* at 43:18–44:16, 44:23–45:18.) The purpose of the quarterly bonuses is to incentivize efficient, safe, and productive work. (Parks Dep. 31:2–10, 31:17–20.)

### 4. Calculation of Overtime Pay

Defendant uses only base pay to calculate its employees' overtime pay. (*Id.* at 42:19–43:17.) Neither stage pay nor quarterly bonuses are included in the number which is multiplied by one and one-half to determine the rate per hour an employee is entitled to for hours worked over forty. (*See id.*) Additionally, Defendant only paid overtime for hours worked over sixty, not forty. (*Id.* at 42:6–9.)

Plaintiff alleges that Defendant violated the FLSA, OMFWSA, and OPPA by depriving Plaintiff, and those on whose behalf he brings the suit, of proper overtime compensation for the hours they worked over forty per week. (Compl. ¶¶ 43, 49, 59, 70.) Defendant contends it did not violate the FLSA, OMFWSA, or the OPPA, because it paid its employees pursuant to a valid

Belo contract.[2] (Def.'s Mot. Summ. J. at 2, ECF No. 62.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

---

[2] The term "Belo contract" is derived from a 1942 Supreme Court case, *Walling v. A.H. Belo, Corp.*, 316 U.S. 624 (1942).

that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n,*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.  DISCUSSION

Plaintiff moves for partial summary judgment with respect to the failure of Defendant's Belo contract, and thus, its failure to pay overtime as required by the FLSA, and Plaintiff's proposed method of calculating damages. (Pl.'s Mot. Summ. J. at 3.) In the alternative, Plaintiff moves for partial summary judgment regarding the nondiscretionary nature of stage pay and quarterly bonuses and the requirement that such bonuses be included in Plaintiff's regular rate of pay for purposes of paying overtime wages. (Pl.'s Contingent Mot. Partial Summ. J. at 3, ECF No. 54.) In addition, Defendant moves for summary judgment on all of Plaintiff's claims. (Def.'s Mot. Summ J. at 1.)

### A.  Validity of Defendant's Belo Contract

The FLSA provides that employers cannot employ employees for a workweek longer than forty hours unless the employee receives overtime compensation "at a rate not less than one and one-half times the *regular rate* at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added). The statute defines the regular rate to include "all renumeration for employment paid to, or on behalf of, the employee." *Id.* at § 207(e). In addition, eight different types of payments are specifically excluded from the definition of a regular rate.[3] *Id.* at § 207(e)(1)–(8).

The statute goes on to provide an exception to the rule requiring overtime compensation

---

[3] In sum, these exclusions include sums paid as gifts, such as those made during holidays, rewards for service, payments made when no work is performed due to vacation, holiday, illness, etc., payments for traveling expenses, payments made where both the fact that it is to be made and the amount given is at the sole discretion of the employer, payments made pursuant to a bona fide profit-sharing or savings plan, talent fees paid to performers, extra compensation by a premium rate for certain hours worked because they are in excess of eight in a day or in excess of normal working hours, extra compensation for work on Sundays, holidays, the seventh day, etc., premiums pursuant to a collective bargaining plan for hours outside of those established by contract, and any value derived from gifts or rights to a stock option, stock appreciation right, or a similar right. *See* 29 U.S.C. § 207(e) (1)–(8).

at not less than one and one-half times the regular rate. *See* 29 U.S.C. § 206(f). This exception

has become known as the Belo contract or Belo plan ("Belo contract"). *See Walling v. A.H. Belo

Corp.*, 316 U.S. 624 (1942) (recognizing the need for an exception to the FLSA's overtime

requirements to provide employees whose work hours fluctuate with the security of a regular

weekly income). The exception provides that an employer does not violate the overtime

requirements if: (1) the "employee is employed pursuant to a bona fide individual contract . . .;"

(2) "the duties of such employee necessitate irregular hours of work;" (3) the contract "specifies

a regular rate of pay of not less than the minimum hourly rate . . . and compensation at not less

than one and one-half times such rate for all hours worked in excess of such maximum

workweek;" and (4) the contract "provides a weekly guaranty of pay for not more than sixty

hours based on the rates so specified." 29 U.S.C. § 207(f). Belo contracts give employees

whose work hours fluctuate a fixed wage, which gives them "the security of a regular weekly

income" so they can have a stable budget. *A.H. Belo*, 316 U.S. at 35. "The question of whether

a contract which purports to qualify an employee for exemption under section 7(f) meets the

requirements is a matter for determination by the courts." 29 C.F.R. § 778.414(a). "This

determination will in all cases depend not merely on the wording of the contract but upon the

actual practice of the parties thereunder." *Id.*

"The employer has the burden of proving that all elements [required under 207(f)] are

present in order to come within the exception." *Donavan v. Brown Equip. & Serv. Tools*, 666

F.2d 148, 153 (5th Cir. 1982); *see also Acton v. City of Columbia*, 436 F.3d 969, 976 (8th Cir.

2006); *Johnson v. City of Columbia, S.C.*, 949 F.2d 127, 129–30 (4th Cir. 1991). "Belo

[contracts] are to be narrowly construed against the employer asserting them . . . and must be

considered in light of their purposes." *Brown Equip. & Serv. Tools*, 666 F.2d at 153 (citing

*Arnold v. Ben Kanowksy, Inc.*, 361 U.S. 388, 392 (1960)).

Plaintiff contends Defendant has failed to satisfy all four required elements for establishing a valid Belo contract exists, and thus, is entitled to summary judgment. Defendant contends it has satisfied all four required elements for establishing a valid Belo contract exists, and thus, it is entitled to summary judgment. As explained below, the Court finds that Defendant failed to meet its burden on one of the four requirements. The Court, therefore, need not address the other three requirements for Defendant has not met its burden of showing all four elements exist. Plaintiff is thus entitled to summary judgment.

1.     The Duties of the Employees Must Necessitate Irregular Hours of Work

A valid Belo contract requires the defendant to show the duties of its employees necessitate irregular hours of work. 29 U.S.C. § 207(f). The Belo contract exception "was created to provide stable salaries for employees whose work weeks fluctuate and who would otherwise face financial burdens from below-normal work weeks." *Donovan v. Tierra Vista, Inc.*, 796 F.2d 1259, 1260 (10th Cir. 1986) (citing *A.H. Belo Corp.*, 316 U.S. at 635.) The Sixth Circuit has not yet interpreted the meaning of "irregular hours" in this statute, but the Fifth Circuit has provided a definition which the Court, in the current situation, finds helpful:

> For hours to be considered irregular within the meaning of section 7(f), they must, in a significant number of weeks, fluctuate well below forty hours per week as well as above, and the fluctuations below forty must result from work requirements, not vacations, holidays, illness or reasons personal to the employee. This follows from one of the basic purposes of the exception, to protect employees against "short" paychecks when the nature of their work requires weeks of substantially fewer than forty hours.

*Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 154 (5th Cir. 1982). The federal regulations explain that the "subsection is not designed to apply in a situation where the hours of work vary from week to week at the discretion of the employer or the employee, nor to a

10

situation where the employee works an irregular number of hours according to a predetermined schedule." 29 C.F.R. § 778.405. Further, "[t]he nature of the employee's duties must be such that neither he nor his employer can either control or anticipate with *any degree of certainty* the number of hours he must work from week to week." *Id.* (emphasis added).

The parties agree that Defendant's non-management oilfield operations employees work irregular hours ranging above and below forty hours per week. (*See* Pl.'s Mot. Summ J. at 14; Def.'s Mot. Summ. J. at 10.) Plaintiff argues, however, that while the schedules are irregular, the duties of the employees do not necessitate this irregularity. (Pl.'s Resp. Def.'s Mot. Summ. J. at 13.) Instead, it is Defendant's scheduled periods of reduced work for its employees, which does not satisfy the second requirement because the irregularity is not inherent in the nature of their work. (*Id.*) (citing *Donovan v. Welex, Div. of Halliburton Corp.*, 550 F. Supp. 855, 858 (W.D. Tex. 1982) (denying the validity of a Belo contract because while a couple of weeks showed low hours due to workload, the majority of low hours were caused by the employer's scheduling, something within its control); *see also Harp v. Cont'l/Moss-Gordin Gin Co.*, 259 F. Supp. 198, 200 (M.D Ala. 1966) (noting that because the plaintiffs were informed each week, in advance, of the number of hours they would work the following week, this "controlled employment" was "contrary to the requirements of a 'Belo' contract").) In contrast, Defendant argues the irregular hours were caused by the nature of the work, not any decision made by Defendant. (Def.'s Mot. Summ. J. at 10)

The Court finds that Defendant has failed to meet its burden to show the cause of the employees' irregular hours was inherent in the nature of the work and beyond Defendant's control. Plaintiff provides numerous examples where employees' time sheets show low hours during weeks the employees had scheduled time off. (*Id.* at 22–25.) For example, Plaintiff

11

DeAngelo Adams's time sheets reflect that in the weeks he worked less than forty hours, he had blocks of days he was not scheduled to work. (Pl.'s Mot. Summ. J. at 23–25; Ex. 5, ECF 52-5.) The same is true of the other collective class members. (*See id.*)

These examples show that generally when employees had low hours it was due to their scheduled time off. This is something within the employer's control because it chose to create two schedule options, both of which gave collective class members high hours some weeks and low hours other weeks. (Parks Dep. 19:8–23.) The regulations make clear that when the hours are irregular because of a decision within the employer's discretion or a predetermined schedule, this is does not fulfill the Belo contract requirement. 29 C.F.R. § 778.405.

Further, while the Court is not aware of a case in this circuit directly on point, the Court stated above that the Fifth Circuit provided a helpful definition of irregular hours within the meaning of this statute. Following this definition, the court in *Donovan v. Welex Division of Halliburton Corporation*, found that the irregular hours of employees who were scheduled by their employer to work five days on and then have two days off was "not the type of irregularity contemplated by the statute." 550 F. Supp. at 878. The court stated that in most cases, though not all, the employees' fluctuating hours were caused by the schedule. *Id.* Further, the court noted the "timing of the days off could be anticipated with reasonable certainty and, by the [d]fendant's own admission, the days off fell at all days of the week irrespective of the work load." *Id.* at 859. The court found the defendant "failed to show the kind of irregularity in non-overtime hours necessary for the valid use of a Belo [contract]," and therefore denied the defendant's motion for summary judgment and granted the plaintiffs'. *Id.*

The facts of the instant case are similar to *Welex* in that the Defendant has chosen to implement a schedule with scheduled days off but has not provided any evidence that the days

off are due to the absence of available work. Instead, Defendant has asserted the days off are implemented to manage the work force and give them the opportunity to be at home. (Parks Dep. 18:12–17, 19:20–23.) In fact, Defendant has asserted that when an equipment operator has time off and is not working, the fracking job is not necessarily over. Instead, another operator is continuing to work in place of the employee who is not working during his time off. (Parks Dep. 20:6–17.) Thus, a lack of work does not drive an employee having low hours.

Additionally, Defendant's argument that the fluctuation in its employees' hours is due to the nature of the work is unpersuasive. As evidence of its contention, Defendant provides only deposition testimony from two individuals. In response to the question "[i]s it fair to say how many hours you worked in a given week over the course of your employment was just determined by the work . . . [h]ow much work there was to do," Nathanial Jones responded "yes." (Nathanial Jones Dep. 97:9–98:4.) Foster was asked a similar question and responded "[r]ight." (Foster Dep. 66:22–67:1.) These statements that the hours were determined by "the work," are vague and Defendant provides no explanation as to what about the work causes such fluctuation. For example, Defendant does not provide any facts to show that the travel time, the complexity of the work, or the type of work being done makes the nature of the hours worked irregular. *See Schweninger v. Advanced Vision Techs., Inc.*, 273 F. Supp. 3d 946, 953 (N.D. Ill. 2017) (finding the employees' duties necessitated irregular hours because variables that determined the length of time employees would need to work were not within the employer's control such as the travel time, type of product being installed, and the number and complexity of repairs.)

Further, while Nathanial Jones testified the fluctuation in his hours was due to the nature of the work he also testified this fluctuation did not prevent him from knowing how much work

he would have on a given day. He testified collective class members did have a short outlook on upcoming assignments. (Nathaniel Jones Dep. at 98:5–17.) Again, the regulations make clear this does not fulfil the Belo contract requirement because here the employees did have knowledge of what hours they would be working in advance of a given week. 29 C.F.R. § 778.405.

This situation was not one where the hours depended on irregular and unpredictable occurrences outside of the employer's control as was the type of situated the Belo contract was intended to cure. *See A.H. Belo Corp.*, 316 U.S. at 631–33. The Defendant has failed to meet its burden to show the cause of the irregular hours is inherent in the nature of the work and beyond its control and thus, Plaintiff has shown he is entitled to summary judgment. *See Schweninger*, 273 F. Supp. 3d at 954

### 2. Conclusion as to Purported Belo Contract & Defendant's Liability

The Court finds Defendant did not meet its burden to show it satisfied the second requirement for a Belo contract. Defendant's failure to satisfy one element means Defendant cannot meet its burden to establish a valid Belo contract because it cannot show all four required elements exist.

Without a valid Belo contract Defendant failed to pay its employees according to the FLSA. Defendant's employees were not paid one and one-half times their regular rate for all hours they worked over forty. Instead, they were paid a base pay amount each week without consideration of how many hours they worked over forty and then some additional amount based only on the base pay, irrespective of bonuses, for hours over sixty. (Parks Dep. 42:1–23.) Plaintiff's motion for summary judgement is granted as to the Defendant's liability. Plaintiff and those on behalf of whom he brings this action are thus, entitled to unpaid overtime

compensation.

## B. Plaintiff's Method of Calculating Unpaid Overtime Compensation

Plaintiff has moved for summary judgment with respect to his proposed method of calculating damages. Defendant has stated that Plaintiff's proposed calculations are flawed and requests further briefing on the issue. The Court will allow Defendant a response to Plaintiff's motion and Plaintiff a reply to Defendant's response in accordance with Local Rule 7.2. Plaintiff's motion for summary judgment on the issue of calculation of damages, therefore, is held in abeyance.

## C. Plaintiff's OMFWSA and OPPA Claims

Defendant moves for summary judgment on both of Plaintiff's Ohio law claims. Plaintiff's claims under the OMFWSA and OPPA are indistinguishable from Plaintiff's FLSA claim. The parties agree that both of the Ohio laws require that employers pay their employees consistent with the FLSA. Ohio Revised Code § 4111.03(A) ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hour worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the [FLSA]."); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 732 (S.D. Ohio 2006), aff'd, 225 F. App'x 362 (6th Cir. 2007) (noting that "[c]ourts have uniformly held that Ohio's wage and hour law should be interpreted in accordance with the FLSA" and thus deciding that "the Court's findings with respect to Plaintiffs' FLSA claims apply equally to Plaintiffs' claims under the [OMFWSA]"); *Twaddle v. RKE Trucking Co.*, No. 2:04-CV-557, 2006 U.S. Dist. LEXIS 18028 , *37–38 (S.D. Ohio 2006) (finding that "the Court's rulings with respect to the FLSA claim apply also to the Plaintiff's claim under [§ 4113.15(B) of the OPPA.]") The Defendant's failure to show they

paid their employees in accordance with a valid Belo contract, applies equally to the OMFWSA and the OPPA claims. The Court, thus, denies Defendant's motion for summary judgment on Plaintiff's OMFWSA and OPPA claims and finds Defendant liable to Plaintiff under these acts as well.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** in part and **HOLDS IN ABEYANCE** in part Plaintiff's Motion for Partial Summary Judgment Regarding Belo Contract (ECF No. 52), **DENIES** as moot Plaintiff's Contingent Motion for Partial Summary Judgment (ECF No. 54), and **DENIES** Defendant's Motion for Summary Judgment (ECF No. 62). The Defendant is **DIRECTED** to respond to Plaintiff's Motion for summary judgment on damages and Plaintiff is **DIRECTED** to reply, in accordance with Local Rule 7.2.

**IT IS SO ORDERED.**

_11-14-2019_
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**

16